Breitel, J.
The issue is whether appellant corporation (Camphill) is a covered employer under the Disability Benefits Law (Workmen’s Compensation Law, §§ 200-242) and, therefore, obliged to satisfy the statutory insurance requirements. It has been so determined by the Workmen’s Compensation Board and the determination has been unanimously confirmed, with a memorandum decision, by the Appellate Division. Camp-hill contends that the undisputed evidence shows that it is a charitable corporation, whose coworkers are not employees, but volunteers, and that, therefore, the coworkers are expressly exempted from coverage by the statute.
*204 The question thus presented is exclusively one of law; if the evidence does not provide any basis for the board determination it must be annulled. No issue of fact is presented, either by contradiction or permissible contrary inferences of fact. Because the undisputed evidence does not permit the inference that coworkers were employees in the statutory sense, it is concluded that the order of the Appellate Division should be reversed and the board determination annulled.
Camphill is a New York, tax-exempt, nonprofit membership corporation organized to house, train, and rehabilitate mentally handicapped persons aged 16 years and over. Its incorporation was approved by the State Board of Social Welfare and its activities are licensed and supervised by the State Department of Mental Hygiene. It raises its funds primarily by private tax-exempt charitable contributions. Additionally, some of its income is derived from fixed fees paid on behalf of those whom it assists, and something less than 10% of its income is derived from sales of products made by its residents.
The 11 Camphill movement ’ ’, which originated from the teachings of one Rudolf Steiner, an Austrian, has counterparts in the United Kingdom, the European continent, and Africa. The New York corporation was organized in 1961, at about which time the village community was established in Copake, Columbia County. This community now has in the neighborhood of 31 villagers (the mentally handicapped residents) and 14 coworkers. The coworkers are normal adults who agree to live in and supervise, as separate households in separate buildings, family-like establishments in the village. The object is to train, house, and provide ‘ ‘ warm ’ ’ surroundings for the mentally handicapped by having them live and work with the coworkers and the coworkers’ families. The villagers and coworkers together engage in gardening, farming, dairying, simple carpentry, baking, maintenance, and repair in the community, economically productive crafts, and pursuits with artistic or recreational ends.
The coworkers receive no stipulated compensation and are free to terminate the relationship at any time. They receive full subsistence for their households, including the mentally handicapped villagers, and they also use village funds for recreational and cultural pursuits. The funds are allocated *205 to each household in roughly the amount of $600 for each month, out of which the coworkers make discretionary disbursements for the subsistence and other needs of the entire household. Extraordinary expenses are taken care of as they may arise, as are all medical and dental expenses. The allocation of sums either to the households or within any household does not depend on the work done or on any given assignments of work but is based on needs, within the standards or levels of the community.
A number of coworkers come from abroad where they had been especially trained for their work. Some of these testified that their transfer from abroad was voluntary and that, as a matter of conscience, replacements abroad were arranged before they travelled to their new assignments in this country.
The coworkers are not supervised but use their discretion in satisfying the community standards for the operation of the households and care of the villagers. While there is an executive director, he receives no additional benefits or sums for his work and he disclaimed that he was a superior or manager of the others. Instead, problems are worked out by discussion and consensus among affected groups or the whole community.
All of the testimony uniformly indicated, and the Referee found as a fact, that the coworkers’ attachment to the community was motivated by dedication to the helping of others in need rather than by any career or economic purpose.
Particularly significant is that the allowances provide subsistence for the entire household unit, villagers and coworkers included, and are based on the size and needs of the unit.
Camphill contends that its workers are not covered employees under the Disability Benefits Law since they are ‘ ‘ volunteers in and for a religious, charitable or educational institution ” and, therefore, excluded from coverage (§ 201, subd. 5). A ‘ ‘ volunteer ’ ’, however, is nowhere defined by statute, nor otherwise differentiated from the statutory definition of ‘ ‘ employee ’ ’— that is, ‘ ‘ person engaged in the service of an employer” (§ 201, subd. 5). The board would distinguish between the two groups on the basis of whether or not wages are paid. Camphill does not dispute this basis for distinction. Although there is no explicit statutory authorization for this standard, it conforms to the common understanding that volunteers, as distinguished from employees, are those who do not *206 get paid for their work. Thus, the statutory definition of ‘ ‘ wages ’ ’, that is ‘ ‘ the money rate at which employment with a covered employer is recompensed under the contract of hiring” (§ 201, subd. 12), is an appropriate test for differentiating between volunteers and employees.
The board correctly argues that neither a formal hiring agreement nor the payment of money is required for a finding that there is an employment and that wages have been paid (Matter of Hall v. Salvation Army, 261 N. Y. 110; Matter of Bernstein v. Beth Israel Hosp., 236 N. Y. 268; Matter of Boehm v. Sokol Hall Holding Corp., 274 App. Div. 954). But what is necessary is a finding that there is indeed a legal contract of hire under which the worker obtains benefits as recompense for services rendered (§ 201, subd. 12; see, generally, 1A Larson, Workmen’s Compensation Law, § 47.41).
The evidence established that the coworkers at Camphill do not receive subsistence as recompense for their services, but simply to enable them to carry out their work. The allowances and subsistence are necessary as a condition for the coworkers to perform their services at the times and places required; but they are hardly, on the undisputed evidence, a bargained consideration or quid pro quo for services rendered. The communal living arrangements, although incidentally a means of supplying the coworkers with needs for which they would otherwise have to pay, are a necessary condition for the kind of services they render, and, in fact, are actually the means by which the services are rendered. They, therefore, do not attain the status of employees merely because the allowances and subsistence are provided.
To be sure, wages in a proper case may include subsistence. Indeed, the statute defines wages to include “the reasonable value of board, rent, housing, lodging, or similar advantage received under the contract of hiring ” (§ 201, subd. 12). On the other hand, there may be those who give of their services without compensation and are, therefore, volunteers, although they may at the same time receive housing, food, or other subsistence in order to enable them to serve (Enderby v. Industrial Comm., 12 Wis. 2d 91; Hall v. State Compensation Ins. Fund, 154 Col. 47; see, generally, 1A Larson, Workmen’s Compensation Law, § 47.42, and cases cited).
*207 Thus, it has been held that where subsistence payments do not rest, upon an obligation to render services, there is no contract of hire and no employer-employee relationship (Matter of Seymour v. Odd Fellows’ Home, 267 N. Y. 354, 356). As already observed, the household unit allowances provide subsistence for the entire household, villagers and coworkers included, and are based on the size and needs of the units rather than the output of services or products. Moreover, apportionment of the allowances and subsistence within the households bears no relationship to the services rendered, but relates solely to the needs of the individuals.
The amount of allowances provided is also significant. The undisputed evidence showed that the equivalent value of the average coworker’s allowance, including subsistence, is approximately $30 per week. This minimal allowance further supports the view that the coworkers are not engaged in Camphill activities for any career or economic purpose in the usual sense, but accept subsistence because they would otherwise be unable to render the services (cf. Matter of Bernstein v. Beth Israel Hosp., 236 N. Y. 268, supra). Of course, Camphill and its coworkers may not determine the legal nature of their relationship simply by characterizing it as voluntary and not for economic gain (cf. Matter of Electrolux Corp., 288 N. Y. 440, 444). However, there is not the slightest suggestion in the record, nor does the board ever contend, that any subterfuge is involved. Indeed, the board does not argue that the coworkers are motivated by any considerations other than dedication to the humane tasks upon which they are engaged. This is not to say that low wages or humane motivations can convert an employment into a voluntary arrangement. But in the context of this enterprise, as established by the instant record, these are strong indicia that the subsistence is not being given or received as recompense.
The subsistence, on all of the factors revealed, is then only a condition for rendering the services and not a bargained consideration or a recompense for them.
Finally, the Disability Benefits Law prior to 1960 exempted from mandatory coverage the nonprofitmaking activities of charitable institutions (L. 1956, ch. 204). The wider mandatory coverage of workers for these institutions, after 1960, was obviously intended to be limited, since the ‘ ‘ volunteer ’ ’ excep *208 tion was added at the same time (L. 1960, ch. 791). If there is any wisdom in excluding volunteers who receive subsistence from the ‘1 volunteer ’ ’ exception, as in the case of Camphill, the proper remedy is appropriate legislation such as that which in 1956 covered services by employees in connection with the profitmaking enterprises of charitable institutions (see L. 1956, ch. 204). That is much the better way than straining the statutory nomenclature and ignoring the realities of the relationship in Camphill to require coverage for volunteers whose subsistence bears no correlation to the nature or quantity of services rendered and is received under circumstances which forbid the inference that it is in consideration for those services.
The evident purpose of the statute is to except, as volunteers, charitable workers who dedicate themselves to humane work without expectation of economic gain or benefits in the ordinary or commonly accepted sense. Indeed, if charity workers receiving some subsistence are not included in the exception of “ volunteers ” it is difficult to think of any who are covered by the exception, since charity workers who receive no subsistence nor any moneys at all create no problem requiring the statutory exception. Consequently, on the facts disclosed, the absence of any contradiction of the evidentiary facts, and the absence of any contradiction of the asserted purposes of the activities involved or of the motivations of the coworkers engaged in such activities, the coworkers are not covered employees.
Accordingly, the order of the Appellate Division should be reversed, with costs in this court and in the Appellate Division, and the determination of the Workmen’s Compensation Board annulled.